UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROBIN R. MCDOWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-CV-723-JD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Robin McDowell (McDowell), filed a complaint on November 13, 2012 seeking

review of the final decision of the Defendant, Commissioner of Social Security (Commissioner).

(DE 1)  With the filing of the opening brief (DE 17), response brief (DE 23), and reply brief (DE

26), this matter is ripe for ruling.  Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

McDowell filed for Supplemental Security Income on July 1, 2008, claiming she became

disabled on April 12, 2008 on account of numerous problems including multiple sclerosis or

lupus, arthritis/muscle/joint/back/leg pain, depression, loss of grip and shaking of the hands, and

difficulty walking. (R. 178, 205) McDowell's application for benefits was denied on November

21, 2008. (R. 75) After reconsideration, the application was again denied on March 10, 2009. (R.

80) On April 23, 2009, McDowell filed a request for an administrative hearing seeking a finding

of disability due to fibromyalgia, chronic pain syndrome, asthma, chronic obstructive pulmonary

---

[1]      Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action.  No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

disease (COPD), arthritis, restless leg syndrome, major depressive disorder with psychotic

features, and generalized anxiety disorder. (R. 84, 299-300) A hearing was held on June 24,

2011, in front of Administrative Law Judge Monica Lapolt (ALJ). (R. 40-72) McDowell testified

at the hearing, as did vocational expert Gail Franklin (VE). *Id.* On July 15, 2011, the ALJ

rendered a decision in which she concluded that McDowell was not disabled under the meaning

of the Social Security Act because she retained the residual functional capacity (RFC)[2] to

perform jobs that exist in significant numbers in the national economy. (R. 21-33). McDowell

filed a request for review which was denied by the Appeals Council on September 25, 2012. (R.

1, 15) On November 13, 2012, McDowell filed a complaint with this Court requesting a review

of the Commissioner's final decision. (DE 1)

## II. FACTS

McDowell was born on January 19, 1972 and has completed the 10th grade. (R. 44) She

previously worked as a cashier, bartender, and fast food worker. (R. 31, 206) She was 36 years

old when she filed for disability benefits and 38 years old at the time of the ALJ's decision. (R.

33, 44, 178)

### A.    Impairments

The record reflects a history of treatment for anxiety and pain dating back to 2001, and

thereafter, the extensive medical evidence submitted by McDowell covers numerous

impairments. (R. 302-697)

### 1.    *Medical Evidence from 2001-2004*

On January 12, 2001, McDowell first reported to Dr. Knapp concerns about having

anxiety attacks, sometimes as many as two a day, and crying/shaking spells. (R. 548) Dr. Knapp

---

[2]      Residual Functioning Capacity is defined as the most a person can do despite any physical and mental
limitations that may affect what can be done in a work setting.  20 C.F.R. § 416.945.

concluded McDowell was suffering from stress, acute anxiety, and depression, and as a result, prescribed Valium, Zoloft, Trazodone, and Lorazepam for the short term only. (R. 549) On November 17, 2001, McDowell reported to the emergency room due to anxiety, chest pains, light headedness, and stomach spasms. (R. 544) McDowell followed up with Dr. Knapp twice following the ER visit. (R. 542-5) By July of 2002, Dr. Knapp stated that McDowell was still dealing with anxiety and depression, and still taking Zoloft. (R. 523)

Due to suffering from joint pain, McDowell presented to Dr. Ulker Tok for a rheumatology consultation on February 6, 2004. (R. 468-70) McDowell described occasional diffuse swelling of her hands. (R. 468) Dr. Tok noted that McDowell appeared anxious, tearful, and irritable. (R. 468) Further, Dr. Tok observed tenderness on the joint margins of her shoulders with "active resistance and rigidity to passive range of motion" and he documented "a fine resting tremor of the upper extremities and some cogwheel rigidity of the arms." (R. 469) Dr. Tok ordered diagnostic testing and referred McDowell for a neurology evaluation. (R. 470) Dr. Tok concluded that McDowell did not seem to have an inflammatory rheumatic disease, muscle weakness, or any focal neurological deficit, and noted that McDowell's musculoskeletal exam was normal. (R. 470) Dr. Tok also noted McDowell's significant emotional irritability and believed McDowell likely had an anxiety disorder, and therefore he recommended a psychiatric evaluation. (R. 469-70)

On March 23, 2004, McDowell visited neurologist Dr. Cary reporting intermittent numbness, tingling, and pain in her hands and arms. (R. 315) McDowell described pain that was "cramping, dull, aching, numbing, gnawing, shooting and stabbing" which "comes and goes." (R. 315) Dr. Cary ordered MRIs of her brain to rule out a demyelinating disorder and he ordered an electromyography (EMG) of her limbs to rule out radiculopathy. (R. 317) Additionally, Dr.

Cary recommended neck exercises, physical therapy, and applying heat to her neck, shoulders, and low back. (R. 317) Ultimately, the tests returned unremarkable results. (R. 303, 305, 467) An electrophysiological exam conducted by Dr. Cary was also normal. (R. 305) McDowell continued to complain of weakness in her arms and joints through April of 2004. (R. 503)

At a follow-up with Dr. Cary on June 25, 2004, McDowell complained of deep aching in her arms and right posterior chest. (R. 465) McDowell also described intermittent weakness of her right arm. (R. 465) Dr. Cary noted that the nerve conduction studies were negative and posited that she had "intermittent ill-defined myalgias of the right upper extremity and right posterior chest wall." (R. 466) On August 4, 2004, a pulmonary function test by Sierra Vista Regional Health Center showed that McDowell had minimal airway obstruction and a response to bronchodilators indicating asthma. (R. 502) The test indicated a normal gas volume result and a normal DLCO diffusion capacity.[3] (R. 502)

2.    *Medical Evidence from 2008-2009*

On October 30, 2008, state agent Stephen Bailey performed a psychiatric review technique assessment and opined McDowell had no medically determinable psychiatric impairment. (R. 370-382). Stephen Bailey noted that while McDowell is very detailed about her physical problems, she did not mention any mental symptoms except to say that her physical inability to do things she once did was depressing. *Id.*

On November 14, 2008, McDowell was examined by Dr. Jerome Rothbaum of the Arizona Disability Determination Services. (R. 384-96) Dr. Rothbaum noted that McDowell appeared anxious and had bilateral hand tremors, more on the right hand than the left. (R. 386)

---

[3]        A single breath diffusing capacity of the lung for carbon monoxide (DLCO) test measures how well the lungs exchange gases. The major function of the lungs is to allow oxygen to "diffuse" or pass into the blood from the lungs, and to allow carbon dioxide to "diffuse" from the blood into the lungs. Abnormal results mean that gases do not move normally across the lung tissues into the blood vessels of the lung. U.S. National Library of Medicine from the National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm (last visited Feb. 14, 2014).

Rothbaum concluded that McDowell was suffering from asthma, noncardiac chest pain, anxiety, restless leg syndrome, athralgia ("etiology undetermined") and tremors, but did not believe the conditions warranted any work limitations for twelve continuous months. (R. 388)

On November 20, 2008, Dr. Estes reviewed the evidence of record and concluded that any somatic impairment was non-severe. (R. 397-8) On January 27, 2009, Dr. Fahlberg reviewed the evidence and also concluded that "[n]o somatic MDI [medically determinable impairment] is established." (R. 401-2)

On February 18, 2009, McDowell presented to Dr. Hoffman for a psychiatric consultation regarding her pending claim. (R. 405-408) McDowell complained of pain, difficulty sleeping, diminished energy and appetite, difficulty concentrating, loss of interest, and suicidal ideation. (R. 405) Dr. Hoffman noted McDowell went out to eat with her family about once a month and also played in a billiards league but generally avoided social events as much as possible. (R. 406) Dr. Hoffman documented that McDowell "frequently moved her legs during the exam secondary to 'pain.' She cried/teared up continually during the exam. . . presented [with] what appeared to be both a mildly dysthymic and mildly anxious mood. Affect was congruent with both mood and thought content." (R. 407) Noting McDowell's son died in a motor vehicle accident approximately one year beforehand, which McDowell continued to experience nightmares from, Dr. Hoffman diagnosed McDowell with major depressive disorder with a need to rule out post-traumatic stress disorder. (R. 407-408) Dr. Hoffman also noted that she suffered from chronic pain in her wrists, shoulders, arms, and legs, numbness in her hands, and decreased coordination. *Id.*

On March 10, 2009, Dr. Garland, a psychological consultant, completed a mental RFC assessment and psychiatric review technique assessment. (R. 410-28) Dr. Garland believed that

McDowell suffered from major depressive disorder resulting in moderate limitations with activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, but found that she did not suffer from any episodes of decompensation or evidence establishing the presence of "C" criteria. (R. 415-28) In the RFC assessment, Dr. Garland determined McDowell was moderately limited with regard to: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. (R. 410-2) Ultimately, Dr. Garland concluded that McDowell was able to meet the mental demands of "competitive remunerative, unskilled work on a sustained basis . . . in settings of low social contact" including the ability to understand, remember and carry out simple instructions, make judgments commensurate with unskilled work, respond appropriately to supervision and co-workers, and deal with changes in a routine work setting. (R. 413)

On July 22, 2009, McDowell presented to Dr. Cahn for a neurology examination and consultation. (R. 449-51) McDowell complained of occasional numbness and tingling in all of her fingertips, occasional tremors in both hands, and sporadic episodes of diminished coordination affecting her hands and feet. (R. 449) After an unremarkable examination, Dr. Cahn concluded the claimant's symptoms presented no pattern and her history "suggest[ed] possible

fibromyalgia plus restless leg symptoms." (R. 451) Dr. Cahn wrote that EMG testing might be warranted if her numbness and paresthesia should worsen or persist. (R. 451)

On September 11, 2009, McDowell was seen for the first time at Four County Counseling Center where an intake report was completed. (R. 623-29) McDowell was suffering from severe depressive symptoms due to the loss of her son in a motor vehicle accident on April 23, 2008. (R. 625) McDowell reported having hallucinations since his death, both hearing his voice and seeing his shadow. (R. 625) McDowell described having anxiety attacks in public including shaking and heart palpitations. (R. 625) McDowell reported she had considered suicide in order to be with her son and had formulated a plan. (R. 626) Additionally, McDowell indicated that due to the symptoms she was unable to work. (R. 625) McDowell was assigned a Global Assessment of Functioning (GAF) score of 49.[4] (R. 628) The reported diagnostic impressions were severe major depressive disorder with psychotic features and anxiety disorder. (R. 625)

On October 1, 2009, McDowell went to Four County Counseling Center and reported suffering from a depressed mood, feelings of hopelessness and worthlessness, diminished energy, poor appetite, difficulty sleeping, and anxiety. (R. 429-35) McDowell again reported being overwhelmed by the symptoms caused by the loss of her son. (R. 430) McDowell was diagnosed with major depressive disorder (recurrent, severe) with psychotic features, generalized anxiety disorder, and bereavement, and was assigned a GAF score of 29.[5] (R. 434-35)

---

[4]     A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. See DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS–Text Revision 32 (4th ed.2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to McDowell's appeal, GAF scores were in use. See Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_ Functioning (last visited Feb. 14, 2014). A GAF score of 41-50 indicates serious symptoms, such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as no friends or unable to keep a job.

[5]     A GAF score of 21–30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day, has no job, home, or friends).

During a follow up on November 9, 2009 with Dr. Cahn, McDowell reported feeling "wobbly" and exhausted and she reported joint pain. (R. 447) Dr. Cahn wrote the "[e]xam was somewhat limited at the proximal upper and lower extremities [due] to antalgic guarding, also with some mild give-way weakness at the more distal upper extremities." (R. 448) Dr. Cahn concluded, "I believe she has restless leg syndrome and fibromyalgia, possibly exacerbated by anxiety" and prescribed Meclizine for her vertigo, quinine water for her restless leg symptoms, and recommended a sleep study. (R. 448)

3.    *Medical Evidence from 2010*

During another follow up with Dr. Cahn on January 6, 2010, McDowell reported episodes of vertigo, persistent joint pain, and diminished motion. (R. 444) Dr. Cahn documented "multifocal tenderness to light pressure over multiple joints diffusely and bilaterally" as well as "mild give-way weakness and antalgic hesitation" upon examination. (R. 445) Dr. Cahn observed "some mild patchy sensory changes to multiple modalities which do not follow any dermatomal distribution." (R. 445) Dr. Cahn wrote, "She may have a very early rheumatoid arthritis versus fibromyalgia syndrome, though I suspect many of her symptoms appear related at least in part to some psychogenic overlay." (R. 444-5) Dr. Cahn noted that McDowell had previously not followed through on recommended treatments for her restless leg syndrome. (R. 445)

On February 16, 2010, McDowell underwent a sleep study, which revealed evidence of severe periodic limb movements with some arousals and "minimal sleep disorder breathing." (R. 453) On March 17, McDowell complained to Dr. Cahn of getting poor sleep and having diffuse pain throughout her lower extremities and feet. (R. 442) Dr. Cahn documented "diffuse mild tenderness and palpable mild spasm over the cervical paraspinals and trapezius bilaterally." (R.

443) He further observed that she had a limited range of motion with antalgic guarding. (R. 443)

Dr. Cahn started McDowell on a titrating dose of Savella for her pain. (R. 443) On March 31, Dr.

Cahn administered occipital nerve block and trigger point injections for her headaches, neck and

shoulder pain, and occipital neuralgia. Before doing so, he wrote as follows:

> The patient was evaluated and was found to have tenderness to palpation and light pressure over the right occipital prominence and occipital nerve insertion point, with light pressure eliciting discomfort and parethesias along the ipsilateral occipital nerve territory. She was found to have an additional eight trigger points identified by tenderness and palpable muscle spasm at: The right upper cervical paraspinals (C3); the bilateral mid cervical paraspinals (C5); the bilateral lower cervical paraspinals (C6-C7); the bilateral medial trapezius ridge, and the right lateral trapezius ridge. (R. 441)

At a follow up on April 28, 2010, McDowell reported obtaining some relief from her headaches,

neck pain, and muscle pain from the injections, but complained that the pain and muscle

tightness were "starting to creep back." (R. 439) Dr. Cahn observed that she had limited motion

in the cervical spine due to antalgic guarding, as well as "some palpable muscle spasm." (R. 439-

40) Dr. Cahn referred McDowell for physical therapy. *Id.*

On June 9, McDowell met with Dr. Cahn and described pain in her neck, shoulders, arms,

and back, fatigue and difficulty concentrating. (R. 436) Dr. Cahn documented that she had an

anxious affect and a limited physical examination due to antalgic guarding. (R. 436-7) Dr. Cahn

prescribed Requip for her restless leg symptoms and a low does of Amitriptyline for insomnia,

headaches, neuropathic pain, and mood. *Id.* At a follow up in July, McDowell described an

episode in which she "stayed in bed for three days straight" due to exhaustion and severe pain

from standing. (R. 579) However, it was reported that she was showing a promising response to

Requip. *Id.* McDowell visited Dr. Cahn for a neurology consultation on October 13, and

complained of fatigue, soreness in her lower extremities, and stiffness. (R. 577) All examinations

conducted by Dr. Cahn were unremarkable. (R. 436-52, 577-9)

On August 24, 2010, McDowell complained of diffuse joint pain, worsening fatigue, and hand pain to Dr. McKissick. (R. 563-4) During a follow up in September, McDowell reported experiencing persistent pain and profound weakness, particularly on the right side. (R. 561) Dr. McKissick diagnosed McDowell with having fatigue and restless leg syndrome. (R. 561-2) In October, Dr. McKissick observed minimal swelling of the hands and feet before diagnosing arthritis of the ankle and foot. (R. 557)

Although a non-mutual discharge report dated June 7, 2010 indicated that McDowell failed to follow through on the treatment recommendations by those treating her at Four County Counseling Center (Tr. 615), it appears that on November 11, 2010, McDowell returned to the Four County Counseling Center and another intake report was completed. (Tr. 608-14). The intake report states McDowell was requesting a psychiatric evaluation and medications to help with her depressive order. (R. 612) McDowell reported that she was having thoughts of suicide and was preoccupied with her son's death, even seeing images of him and hearing voices. The report diagnosed McDowell with severe recurrent major depressive disorder with psychotic features, generalized anxiety disorder, and bereavement. The report listed McDowell as having a GAF rating of 49.[6] (R. 614) After another evaluation at Four County Counseling Center in December of 2010, McDowell was assessed as having a GAF score of 45 with a guarded prognosis. (R. 607) The report indicated that her symptoms were consistent with her having severe recurrent major depressive disorder without psychotic features. (R. 606)

On December 3, 2010, McDowell met with Dr. Borgmeier for a rheumatology evaluation and consultation. (R. 459-61) McDowell complained of pain in her ankles, feet, wrists, hands,

---

[6]     A GAF score of 41-50 indicates serious symptoms, such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as no friends or unable to keep a job.

shoulders, neck, forearms, and lower extremities. (R. 459) McDowell also reported experiencing morning stiffness, swelling in her ankles, hands, and fingers, muscle aches and weakness, fatigue, an inability to stand or walk for prolonged periods, and a tendency to drop things. (R. 459) Dr. Borgmeier documented tenderness in the cervical spine, the trapezius muscles, the medial scapular borders, the L5, the sacroiliac joint region, the PIP joints, the MCP joints, both wrists, both elbows at the lateral epicondyles, both shoulders, the trochanteric bursae, both ankles, and the left Achilles tendon. (R. 460-1) He observed a mildly diminished range of motion in all planes, diminished muscle strength in the legs, diminished grip strength, crepitus in the left knee, and discomfort in the lateral hip area upon administration of a Patrick's test. (R. 461) Dr. Borgmeier concluded that McDowell's symptoms and his examination findings were "most suggestive of fibromyalgia." (R. 461)

On December 20, 2010, McDowell presented to the emergency room with complaints of neck pain. (R. 631-2) The examining clinician observed that McDowell appeared "somewhat anxious" and documented tenderness to palpation in the cervical spine. (R. 634) McDowell was released after a CT scan of her cervical spine produced unremarkable results. (R. 637-9)

### 4. *Medical Evidence from 2011*

On February 9, 2011, treating physician Dr. McKissick completed a physical RFC questionnaire and noted that McDowell suffered from weakness, dizziness, and chronic pain, and indicated that she experienced "good and bad days." (R. 648-9) Dr. McKissick reported he has seen McDowell approximately every month since August of 2010 for her chronic pain syndrome, restless leg syndrome, depression, and arthritis. (R. 648) Dr. McKissick listed her symptoms as including weakness, dizziness, and chronic pain. (R. 648) Dr. McKissick opined that McDowell could never bend (stoop), squat, or climb ladders, and she could only occasionally twist and

climb stairs (R. 649). Dr. McKissick expected McDowell's impairments to last at least twelve

months. (R. 648)

On April 21, McDowell presented to the emergency room due to a panic attack. (R. 652)

The attending physician noted McDowell's hands were trembling and she was hyperventilating.

(R. 653-4) McDowell also reported experiencing back pain and tingling in both hands. (R. 654,

658) A chest x-ray evidenced hyperinflation consistent with chronic obstructive pulmonary

disorder. (R. 660) A spirometry was performed and the lung diffusion testing evidenced a DLCO

measuring 9.8 mL/mm HG/min or 36 percent of the predicted normal value. (R. 670)  The

interpreting physician diagnosed mild airflow obstruction with a severely reduced diffusing

capacity and concluded such results where indicative of emphysema.[7] (R. 672)

In a mental RFC questionnaire completed on July 11, 2011 by a mental health worker at

the Four County Counseling Center, McDowell's prognosis was noted as "guarded" pending

treatment follow-through. (R. 675) Additionally, McDowell symptoms were reported as

including decreased energy, thoughts of suicide, difficulty thinking or concentrating, motor

tension, hallucinations, and memory impairment, among others. (R. 676) McDowell's RFC

indicated that she was unable to complete a normal workday and week without interruptions

from psychological symptoms; accept instruction and respond appropriately to criticism from

supervisors; and deal with normal work stress. (R. 677) McDowell was seriously limited in her

ability to remember work-like procedures; sustain an ordinary routine without special

supervision; make simple work related decisions; work in coordination with others without being

unduly distracted; perform at a consistent pace without an unreasonable number and length of

breaks; get along with co-workers and peers; respond appropriately to changes in a routine work

---

[7]      The spirometry results also stated "[s]everely reduced diffusing capacity" (R. 672); "combination of
reduced DLCO and airflow obstruction suggests emphysema" (R. 672); "lungs are hyperinflated suggesting COPD"
(R. 660, 669); and finally, "CONCLUSION: HYPERINFLATION CONSISTENT WITH COPD." (R. 660, 669)

setting; and understand, remember, and carry out detailed instructions. (R. 677-78) McDowell was noted as having memory impairment due to psychological distress, becoming overwhelmed easily, and experiencing paranoia, hallucinations, pervasive sadness, and panic attacks. (R. 677) It was expected that McDowell would miss more than four days of work per month due to her impairments and treatment, and that her impairments would last at least twelve months. (R. 679)

## B.     June 24, 2011 ALJ Hearing

*1.     Testimony of McDowell*

McDowell described having worked as a bartender and as a convenience store attendant. (R. 46-8) She stopped working in 2008 after her son died "[b]ecause I [was] dropping things at work. I couldn't lift up the boxes to stock the shelves and moving [sic] things around." (R. 53)

McDowell described her troubles performing daily activities such as cooking, vacuuming, and washing dishes and laundry, and testified that she had to take breaks before completing her tasks because she had pain in her legs and arms. (R. 53-5) McDowell's daughter helped her with the laundry, and McDowell could not do any yard work. McDowell was able to drive and she occasionally went grocery shopping for the family, although she preferred not to go in public places by herself. (R. 56-8) She also experienced panic attacks and fatigue. (R. 57-8)

McDowell described how her current medications did not relieve her pain and caused her to become "loopy" and tired. (R. 60) McDowell indicated that her therapy with Four County Counseling Center only helped a little. She also continued to experience breathing problems and had developed lumps on her hands that "develop out of nowhere." (R. 60-62) McDowell suffered from pain in her arms and hands and stiffness in her fingers, hands, wrists, knees, shoulders and ankles. (R. 63)

2.      *Testimony of the Vocational Expert*

The VE classified McDowell's past work as a bartender as light-strength with an SVP[8] of 3, and indicated that her previous positions as a cashier and as a fast-food worker were light-strength jobs with an SVP of 2, according to the Dictionary of Occupational Titles. (R. 64-6)

The ALJ then asked the VE to analyze the type of work that hypothetical individuals could perform based on particular RFCs. (R. 65) First, the ALJ asked the VE to consider an individual capable of performing a full range of light work and having the mental capacity to understand, remember, and follow simple instructions in the context of performing simple, routine, repetitive, concrete, and tangible tasks. (R. 65-66) The individual could also sustain attention and concentration in order to carry out tasks with reasonable pace and persistence.

The VE testified that someone with those limitations would be able to perform McDowell's previous jobs as cashier and fast-food worker, either as actually performed by McDowell or as generally performed in the national economy.[9] However, with the additional limitation of "no transactional interaction with the public", then McDowell's past jobs would be eliminated. (R. 65) But such a hypothetical claimant could perform light work occupations with an SVP of 2, including a night office cleaner, a laundry worker, and a garment sorter. (R. 66)

However, if one could not be exposed to concentrated airborne irritants, including but not limited to fumes, odors, dust, and gasses, then better options for light work jobs with an SVP of 2 were "survey worker clerk" (1,498 positions existing in the state of Indiana, and 98,370 jobs existing nationally), plastics hand packager (1,024 positions existing in the state of Indiana, and

---

[8]      SVP stands for "specific vocational preparation," or the Dictionary of Occupational Title's way of measuring the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the abilities needed for average performance in a specific work situation.

[9]      In addition, these jobs could be performed with the added restriction of no exposure to concentrated airborne irritants. (R. 65, 67)

25,233 jobs existing nationally), and mailroom clerk (549 positions existing in the state of Indiana, and 29,262 positions existing nationally) (R. 67-9). The same individual could perform sedentary work as a table-worker, document preparer, and circuit board assembler. (Tr. 66-69)

The VE also testified that an individual who needed to take a five to ten minute break per hour would not be able to sustain employment. (R. 69) And, an individual who needed to be off-task one-quarter to one-third of the day regularly would similarly not be able to sustain employment. (R. 69) Finally, the VE testified that an individual who was not able to sit, stand, or walk, for eight hours in a workday would not be able to sustain employment. (R. 69-70)

**C.      Opinion of the ALJ**

First, the ALJ determined McDowell had not engaged in substantial gainful activity since June 22, 2008. (R. 23)

Second, the ALJ concluded McDowell had severe impairments of major depressive disorder, anxiety, asthma, and possible fibromyalgia. (R. 23) The ALJ further found that McDowell's lupus, rheumatoid arthritis, and multiple sclerosis were not severe impairments, but were non-medically determinable conditions. (R. 23) The ALJ explained that these were only possible diagnoses considered by treating physicians, however the record evidence was devoid of any objective tests supporting these conditions. (R. 23)

Third, the ALJ determined McDowell did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) ("Listings"). (R. 24-25) The ALJ considered McDowell's asthma under Listing 3.03, and found that there was not sufficient evidence of chronic asthmatic bronchitis or asthma attacks. (R. 24) The ALJ applied Listing 1.02 to McDowell's symptoms of fibromyalgia. (R. 24) The ALJ decided Listing 1.02

was not met because McDowell did not have a significant restriction of function in the affected joints and because the treating specialist, Dr. Cahn, did not formally diagnose McDowell with fibromyalgia, but found that McDowell's presentation only suggested fibromyalgia. (R. 24) The ALJ further concluded that McDowell's mental impairments failed to meet the criteria of Listings 12.04 and 12.06 because the ALJ believed McDowell had only mild restrictions in her ability to perform activities of daily living, moderate difficulties with social functioning, and moderate limitations in her ability to maintain concentration, persistence, or pace for extended periods of time. (R. 24-25) The ALJ discovered no evidence of episodes of decompensation, and no evidence establishing the presence of "paragraph C" criteria. (R. 25)

The ALJ concluded McDowell had the RFC to perform light work as defined by 20 C.F.R. § 416.967(b), except with the following limitations: the mental capacity to understand, remember and follow only simple instructions in the context of performing simple, routine, repetitive, concrete, tangible tasks, with only brief superficial interactions with coworkers, supervisors and the public, and no concentrated exposure to airborne irritants. (R. 26) The ALJ found that within these parameters McDowell was able to carry out work-like tasks with reasonable pace and persistence.

The ALJ found that McDowell's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but found McDowell's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible (R. 26). The ALJ determined McDowell's descriptions of her symptoms were so severe that they were not supported by the medical evidence as a whole. (R. 29-30) In finding McDowell's complaints incredible, the ALJ specifically set forth the factors provided by 20 C.F.R. § 416.929(c), and

discussed these factors in relation to the evidence which supported the ALJ's conclusion that McDowell's description of her limitations was not consistent with the record. (R. 29-1)

Based on the ALJ's RFC determination, the ALJ reasoned that McDowell was unable to perform her past relevant work which required work with the public (R. 31), but that jobs existed in significant numbers in the national economy that McDowell could perform, including work as a "survey worker clerk," "plastics hand packager" and "mailroom clerk." (R. 32) Considering the VE's testimony, the ALJ concluded that McDowell was not disabled. (R. 33)

### III. STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if

it lacks evidentiary support or an adequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 416.920(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a

combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 416.920(a)(4)(i)-(ii).  At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 416.920(a)(4)(iii).  However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 416.920(e).  The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

McDowell contends the decision of the ALJ is not supported by substantial evidence because the ALJ (1) failed to consider whether McDowell's breathing problems met Listing 3.02 and failed to include an adequate discussion of the evidence pertinent to Listing 3.02; (2) failed to adequately consider all of McDowell's limitations in the RFC determination; and, (3) failed to propose hypotheticals to the VE which included all of the social limitations that were contained in the ultimate RFC finding (and thus, the faulty hypotheticals relied on by the VE did not accurately indicate which jobs could be performed by McDowell).

**A.      The ALJ's failure to discuss the April 2011 DLCO test result and provide a thorough analysis of Listing 3.02**

McDowell claims that the ALJ wholly failed to consider Listing 3.02 and the April 2011 DLCO result which supported a finding that McDowell met Listing 3.02 on account of her respiratory problems. (DE 17 at 14-15)  In addition, rather than soliciting a physician's opinion on whether or not McDowell satisfied the criteria for Listing 3.02, the ALJ simply assumed the

absence of equivalency without any relevant discussion. (DE 17 at 15-16)  The Commissioner argues that the ALJ is not required to discuss a Listing by name and McDowell failed to show she met the Listing with a one-time DLCO result which indicated a "suggested" diagnosis of emphysema. (DE 23 at 6-7)

While the Commissioner is correct that an ALJ need not explicitly refer to a relevant Listing, this is true in cases where it is clear on review that the ALJ discussed the relevant evidence in determining that no applicable Listing was met. *See Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) ("we can safely conclude the ALJ considered and applied the appropriate Listing" where only one Listing was applicable to the claimant and the ALJ discussed the record evidence which showed that the Listing criteria was not met).  However, in this case, the ALJ's opinion itself demonstrates that several Listings were applicable to McDowell.  And with respect to McDowell's respiratory problems, the ALJ explicitly discussed whether McDowell met Listing 3.03 for her asthma, but the ALJ never discussed whether McDowell met Listing 3.02 for chronic impairment of gas exchange due to clinically documented pulmonary disease.

Listing 3.02 provides the standards for disability based on chronic pulmonary insufficiency, and where existing evidence is not adequate to establish the § A requirements for chronic obstructive pulmonary disease or the § B requirements for chronic restrictive ventilator disease, under § C, a single breath diffusing capacity of the lung for carbon monoxide (DLCO) may be used to prove a chronic impairment of gas exchange. 20 C.F.R. pt. 404, subpt. P, app 1, § 3.00. To meet Listing 3.02C(1), a single breath DLCO result must be less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value. *Id*. at § 3.02C.

Here, McDowell's April 2011 DLCO measured 9.8 mL/mm HG/min or 36 percent of the predicted normal value, and thus she could be considered disabled under Listing 3.02C(1).

However, in discussing whether McDowell met a Listing, the ALJ not only failed to mention Listing 3.02 or discuss its requirements, but the ALJ failed to discuss McDowell's 2011 DLCO test results which supported a finding that the Listing was met.[10] As a result, the ALJ committed reversible error by failing to discuss a specific Listing and failing to provide a sufficient analysis of the evidence relevant to the Listing, especially when there was conflicting evidence about whether McDowell met Listing 3.02. *See Ribaudo v. Barnhart,* 458 F.3d 580, 583 (7th Cir. 2006); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *see also Johnson v. Barnhart*, 66 Fed. App'x 285, 288-89 (3rd Cir. 2003) (declining to determine whether the claimant's two qualifying DLCO scores met the requirement for 3.02C(1), but holding it was error for the ALJ to have ignored the supporting test results or explain why he discounted the evidence); *Carter v. Colvin*, No. 12 C 1431, 2013 WL 3944205, *6 (N.D. Ill. July 30, 2013).

Without acknowledging that the April 2011 test result itself met the Listing requirement, the Commissioner argues that the overall record evidence fails to show that McDowell's condition met the requirements of Listing 3.02. While it is true that Listing 3.00F(1) indicates that a DLCO value used for disability adjudication *should* represent the mean of two acceptable tests, it also states that a DLCO study *should* be purchased in cases in which there is documentation of chronic pulmonary disease, but the existing evidence, including a properly performed spirometry, is not adequate to establish the level of functional impairment. C.F.R. pt. 404, subpt. P, app. 1 § 3.00F(1). The Listing also provides that the purchase of a DLCO study may be appropriate when there is a question of whether an impairment meets or is equivalent in severity to a Listing, and the claim cannot otherwise be favorably decided. *Id.*

---

[10] In discussing McDowell's RFC, the ALJ alluded to the 2011 spirometry test (R. 27), but did not discuss its results for purposes of determining whether McDowell met a Listing at step three of the analysis.

In this case, the ALJ failed to acknowledge in her step three discussion that the April 2011 medical tests indicated that McDowell had "[s]everely reduced diffusing capacity," that the "combination of reduced DLCO and airflow obstruction suggest[ed] emphysema," and that films of her chest showed that her lungs were hyperinflated consistent with COPD (R. 660, 672, 669) In short, this case must be remanded because the ALJ did not minimally articulate her reasons for discounting the evidence supporting a disability finding under Listing 3.02. *See Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004) (stating the ALJ must confront the evidence in the record that does not support his conclusion and explain why it was rejected); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002) (noting that the ALJ's failure to discuss evidence in light of the Listing's analytical framework left the court "with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"). On remand, the ALJ must build a logical bridge between the evidence concerning McDowell's respiratory problems in light of Listing 3.02C(1) and consider whether a further DLCO test or an updated medical opinion might be necessary consistent with SSR 96-6p.

**B.      The ALJ's failure to consider evidence suggesting McDowell was further limited in rendering the RFC determination**

Having determined that remand is necessary, the Court need not rule definitively on McDowell's remaining arguments. However, for the sake of completeness and to help ensure that the Commissioner's decision on remand is free from further errors, the analysis on remand should also include an adequate discussion of the existing medical evidence relied on for the RFC determination.

McDowell contends the ALJ erred by cherry picking evidence of non-disability and by "playing doctor" when making the RFC determination.  McDowell specifically alleges that the ALJ failed to consider evidence supporting additional physical limitations caused by her

fibromyalgia, COPD, and restless leg syndrome. The Commissioner argues that McDowell only relies on her own statements to establish that she is further disabled (rather than point to any medical evidence that undermines the ALJ's RFC finding), and the Commissioner believes that the ALJ correctly observed that McDowell was not actually diagnosed with fibromyalgia.

For the reasons discussed below, the Court believes the ALJ failed to consider evidence indicating McDowell was diagnosed with fibromyalgia and may be further limited by the impairment. In addition, for purposes of remand, the Court notes that the ALJ failed to consider evidence concerning McDowell's mental limitations as well.

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. § 416.945(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence, *see* 20 C.F.R. § 416.945(a)(3), and he is required to determine which treating and examining doctors opinions should receive weight and must explain the reasons for these findings. 20 C.F.R. § 416.927(c). The ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 416.945(a)(2), and the ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. § 416.946(c). An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

In determining that McDowell's fibromyalgia did not prevent McDowell from performing light work, the ALJ made statements that were inconsistent with the various medical

opinions upon which she relied. First, the ALJ concluded that McDowell could perform work at the light exertional level because her "diagnostic testing and physical examinations [were] normal." (R. 27) In making this statement, the ALJ relied in part on the physical consultative examination performed by Dr. Rothbaum in November 2008, which, according to the ALJ, showed that McDowell had good muscular strength in the lower extremities and normal squatting and heel/toe and tandem walking. *Id.* Yet, this same medical record indicated that Dr. Rothbaum specifically diagnosed McDowell with "arthralgias, etiology undermined" and noted the need to rule out lupus and multiple sclerosis (R. 387). The ALJ did not mention these findings.

Second, the ALJ concluded that McDowell's ability to perform light work was supported by Dr. Cahn's July 2009 opinion that McDowell's symptoms only *suggested* fibromyalgia syndrome. (R. 440). But, the ALJ did not discuss the fact that Dr. Cahn later opined in November 2009 that he believed McDowell actually suffered from restless leg syndrome and fibromyalgia (R. 448). Nor did the ALJ refer to the fact that in March 2010, Dr. Cahn documented McDowell's having "tenderness to palpation and light pressure over the right occipital prominence and occipital nerve insertion point, with light pressure eliciting discomfort and parethesias along the ipsilateral occipital nerve territory . . . [and] an additional eight trigger points[11] identified by tenderness and palpable muscle spasm . . .". (R. 441).

Third, the ALJ relied on rheumatologist Dr. Borgmeier's December 2010 evaluation and consultation for her conclusion that the "physical examination did not corroborate [McDowell's] alleged symptoms" of muscle and joint pain throughout her body, occasional muscle aches,

---

[11] *See, e.g.,* SSR 12-2p (requiring the following evidence to establish that a person suffers from fibromyalgia for purposes of a disability determination: "A history of widespread pain . . . that has persisted (or that persisted) for at least 3 months . . . [and] may fluctuate in intensity and may not always be present; [a]t least 11 positive tender points on physical examination . . . found bilaterally . . . both above and below the waist; and [e]vidence that other disorders that could cause the symptoms or signs were excluded."

dropping things, poor sleep, and fatigue. (R. 28) Yet, in relying on Dr. Borgmeier's report, the ALJ referred only to the findings which supported McDowell's ability to work, and did not refer to the documented tenderness in her cervical spine, trapezius muscles, medial scapular borders, L5, sacroiliac joint region, PIP joints, MCP joints, wrists, elbows, shoulders, trochanteric bursae, ankles, and left Achilles tendon, as well as her diminished range of motion in all planes, diminished muscle strength in the legs, diminished grip strength, crepitus in the left knee, and discomfort in the lateral hip area. (R. 461)

Fourth, the ALJ discounted McDowell's primary treating physician's February 2011 opinion that McDowell was unable to bend (stoop), squat/crouch, or climb ladders, because Dr. McKissick did not provide physical findings to support the limitations and the findings were inconsistent with an older 2008 examination. Yet, the ALJ discounted this aspect of Dr. McKissick's without acknowledging his monthly treatments of McDowell and without discussing the various other factors that are to be considered under 20 C.F.R. § 404.1527(c) and SSR 06-03p, when determining the weight to be given a medical opinion (let alone a treating source opinion which would normally be entitled to controlling weight absent sufficient explanation for discounting the opinion). *See id.* (noting that unless given controlling weight as a treating source, the factors to be considered in deciding the weight to be given any medical opinion are the examining relationship (with more weight given to an opinion of an examining source); the treatment relationship, which includes the length, frequency, and nature of the treatment; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the

opinion).  In essence, the ALJ failed to consider relevant record evidence indicating McDowell was diagnosed with fibromyalgia and may be further limited by the impairment.

And finally, the ALJ gave "great weight" to the state agent opinions of Dr. Estes (whose opinion was rendered on November 20, 2008) and Dr. Fahlberg (whose opinion was rendered on January 27, 2009), despite the fact that these physicians never reviewed McDowell's post-2009 records which provided significant substantive evidence of McDowell's further medical impairments (as detailed in the above factual background). *See Staggs v. Astrue*, 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011).  Additionally, Drs. Estes and Fahlberg never indicated whether McDowell retained the RFC to perform light work, although they found that she did not suffer from a somatic medically determinable impairment.

Plaintiff's counsel specifically referred to many of the records identified herein to support McDowell's position that the ALJ failed to consider evidence indicating McDowell's fibromyalgia and physical limitations were more severe than assessed by the ALJ.  The Court agrees that the ALJ cherry-picked through this evidence and failed to acknowledge evidence supporting a finding of disability based on McDowell's physical limitations.  And, for purposes of remand, the Court also notes that the ALJ did not properly consider other medical records evidencing McDowell's mental limitations.

In particular, the ALJ seemingly gave credit to the opinions found in the Four County Counseling Clinic (FCCC) medical records (R. 28-30), which revealed that McDowell suffered from extended periods of severe major depressive disorder, anxiety attacks, and suicidal thoughts after the death of her son. (R. 434-435, 606-614, 623-629)   However, the ALJ did not discuss those records with any sort of specificity and wholly failed to acknowledge the consistently low GAF scores (generally ranging from 45-49) which were indicative of serious symptoms—

including serious impairment in social or occupational functioning. *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) ("A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [claimant] was mentally capable of sustaining work."). In fact, at one point, McDowell was assessed with a GAF score of 29, which was indicative of a complete inability to function. (R. 434-435) In addition to the scores themselves, the ALJ failed to consider or explain how the GAF scores did not affect the considerable weight given by the ALJ to the earlier report of Dr. Garland (R. 30), who opined in March 2009 that McDowell was able to meet the mental demands of unskilled work on a sustained basis in settings of low social contact.

On remand, the ALJ should explain the weight afforded to McDowell's counseling records[12] and provide an adequate discussion of whether the contents of McDowell's mental health records, including the GAF scores contained therein, support further work restrictions and/or a finding of disability.

**C.     The ALJ's failure to posit the same social limitations in the hypotheticals to the VE as ultimately determined to exist in the RFC**

McDowell argues that the step five determination is flawed because the ALJ never presented any restrictions to the VE which accounted for McDowell's difficulty with interacting with co-workers and supervisors. (DE 17 at 24) The Commissioner admits that McDowell is correct, but contends that in reality the ALJ did not limit McDowell's interactions with coworkers and supervisors because the ALJ had based her mental RFC finding on the opinion of Dr. Garland, who in turn opined that McDowell could "[r]espond appropriately to supervision, coworkers and work situations" (DE 23 at 12).

---

[12]        The Court would note that the record contains additional counseling records from July 11 and August 15, 2011, which were apparently provided after the ALJ issued her decision. (R 674-685). These records indicate that McDowell suffered from mental impairments that were expected to last at least twelve months and would require her to miss more than four days of work per month.

The Commissioner's position cannot be accepted where the ALJ, in no uncertain terms, explicitly limited McDowell to performing jobs with only brief, superficial interactions with coworkers, supervisors, and the general public (R. 26). In so limiting McDowell's ability to perform work around others, the ALJ relied on other records, beyond that of Dr. Garland's opinion, which supported the social limitation. (R. 29)

Moreover, it is clear that the hypothetical questions posed to the VE were flawed. The ALJ's hypothetical questions to the VE included, in relevant part, the limitation of "no transactional interaction with the *public*." When posing hypothetical questions to the VE, the ALJ *never* included any limitation concerning interactions with *coworkers and supervisors*. Based on the hypotheticals given, the VE testified that McDowell's past jobs would be eliminated, but she could perform work at the light exertional level as a survey worker clerk, a plastics hand packager, and a mailroom clerk.

Based on the VE's testimony, the ALJ concluded at step five that McDowell was capable of performing work as a survey worker clerk, a plastics hand packager, and a mailroom clerk, and therefore, McDowell was deemed not disabled. However, as mentioned, the ALJ's RFC finding indicated that McDowell could perform work which involved only brief, superficial interactions with coworkers, supervisors, and the general public. And these additional social limitations, which were not presented to the VE, substantially reduced the number of jobs available to the claimant. *See* SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to . . . respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a

finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.").

Because the added restrictions involving the limited ability to interact with co-workers and supervisors were not included in the hypotheticals to the VE, the VE's testimony did not sufficiently establish that McDowell could in fact perform the other work identified by the VE.[13] *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (noting that ALJ's must provide vocational experts with a "complete picture of a claimant's residual functional capacity."). On remand, once the ALJ poses sufficiently supported hypothetical questions to the VE, then the ALJ will be in a position to rely on the VE's testimony in order to determine if there is additional work of which McDowell is capable of performing. 20 C.F.R. § 416.920(e).

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** McDowell's request to remand the ALJ's decision. [DE 1]. This case is **REMANDED** for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED:  March 18, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court

---

[13]     Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the ALJ asked hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant himself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).